[Cite as *State v. Brown*, 2015-Ohio-3718.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLANT,

    **CASE NO. 9-15-05**

    v.

AMBER LEIGH BROWN,

    **O P I N I O N**

    DEFENDANT-APPELLEE.

Appeal from Marion County Common Pleas Court
Trial Court No. 14-CR-0519

Judgment Reversed and Cause Remanded

Date of Decision: September 14, 2015

APPEARANCES:

    *Denise M. Martin* **for Appellant**

    *Joel M. Spitzer* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant the State of Ohio ("the State") brings this appeal from the judgment of the Court of Common Pleas of Marion County granting the motion to suppress filed by defendant-appellee Amber Brown ("Brown"). For the reasons set forth below, the judgment is reversed.

{¶2} On October 7, 2014, Lieutenant Christy Utley ("Utley") and Detective Mike Wheeler ("Wheeler") responded to a 9-1-1 call regarding an unresponsive female. Tr. 7.[1] Utley testified that she went to the scene pursuant to the policy at the Marion County Sheriff's Office that members of the drug unit will respond to any call regarding an overdose to preserve evidence and talk to the suspects and/or victims. Tr. 21. After speaking with Brown, Utley learned that Brown had used heroin that day. Tr. 12.

{¶3} On November 20, 2014, the Marion County Grand Jury indicted Brown on one count of possession of heroin in violation of R.C. 2925.11(A)/(C)(6), a felony of the fifth degree. Doc. 1. Brown filed her motion to suppress 1) any test results of Brown's drug levels, 2) statements made by Brown, 3) her exercise of her right to remain silent, and 4) the observations and opinions of the police officers obtained from the warrantless search and seizure of the defendant. Doc. 25. Brown's motion argued that the statements were made while

---

[1] As there are two hearings, the suppression hearing transcript will be identified as "Tr." The second hearing, which was held on January 21, 2015, will be identified as "2Tr."

she was in custody. *Id.* On Wednesday, January 14, 2015, a hearing was held on the motion to suppress. Doc. 31.

{¶4} At the hearing, the following testimony was provided by the State. Utley testified on direct examination that at the time in question, she was assigned to the Drug Task Force Unit as a detective. Tr. 6. Utley testified that she and Wheeler became involved in the case when she received a call from Major Corwin who informed them that dispatch had received a 9-1-1 call of an unresponsive female and asked them to respond. Tr. 6-7. At that time, she knew nothing other than there was an unresponsive female and that the Emergency Medical Technicians were en route. Tr. 7. Utley testified that Deputy Fohl had arrived at some point in time, but that he did not do anything while he was there. Tr. 8. Upon her arrival to the home, Utley testified that there were already three or four EMTs present along with Brown's mother, sister, brother, and boyfriend. Tr. 8. Utley testified that when she entered the room she asked where the unresponsive person was and learned that it was Brown who was sitting on the couch at that time. Tr. 9. The EMTs indicated that they had given her Narcan and that they were done treating her. Tr. 9. When Utley asked Brown what had happened, Brown told her that she had not felt well, so she laid down on the couch and awoke to find the EMTs standing over her. Tr. 9. One of the EMT's told her that they had attempted a sternum rub when they arrived, but received no response, so they administered Narcan. Tr. 9.

{¶5} When Utley first started talking to Brown, Brown was "a little groggy" and Utley noted that there was a lot of commotion in the house. Tr. 10. Brown had already signed off with the EMTs and indicated that she did not wish to be transported to the hospital. Tr. 10. Utley testified that she spoke to Brown for between 15 to 20 minutes and during that time, Brown became more responsive and appeared to understand the questions asked. Tr. 11. At no point during the conversation did Utley tell Brown that she was under arrest or that she was not free to leave. Tr. 12. Utley asked Brown if she was using and was told no. Tr. 12. Utley then asked Brown to show her arms to Utley and Utley observed what appeared to be a fresh needle mark. Tr. 12. Brown told Utley that the mark was from pulling a hair out. Tr. 12. Utley responded that she did not believe Brown and told Brown to be honest. Tr. 12. Eventually Brown admitted that she had used heroin. Tr. 12. Brown admitted that her boyfriend had injected her with heroin in the bathroom earlier in the day. Tr. 13. Utley testified that she did not arrest Brown on that day. Tr. 13. During the conversation one of the EMTs was present the whole time, but Wheeler and Major Corwin were in and out of the room. Tr. 14. After Brown's boyfriend indicated that he had drug paraphernalia in a book bag in the house, Brown showed them where it was. Tr. 15. While speaking with Brown, Utley was standing in front of Brown while Brown was sitting on the couch. Tr. 16. The entire conversation occurred in the living room of the home, where Brown resided. Tr. 18.

{¶6} On cross-examination, Utley testified that she was only dispatched to the scene because the office had implemented a new program "that anytime that there was an overdose that they would send the – the Drug Unit guys there so that way we could preserve the evidence and talk to the – to the suspects and victims." Tr. 20-21. When Utley and Wheeler arrived at the home, they saw no one and entered the home through the backdoor of the residence. Tr. 21. Utley testified that when they arrived, the door was shut, that they did not knock, and that they just opened the door and walked into the home. Tr. 21-22. No one at the residence gave them permission to enter the home. Tr. 22. Utley and Wheeler were dressed in plain clothes, but were wearing their badges around their necks. Tr. 22. Utley did not identify herself to the EMTs, but did tell Brown that she was with the Narcotics Unit. Tr. 22. When Utley arrived, she believed that Deputy Fohl was already there, but she did not see him and did not know where he was. Tr. 23. Utley testified that she then spoke to Brown from a distance of two to three feet. Tr. 25. Utley testified that at one point she went outside to speak with the boyfriend, but did not recall what she told Brown about leaving the couch before she left. T.r 25. However, upon her return, Brown was still sitting on the couch where Utley had left her. Tr. 25. Utley also admitted that she did not know what she would have done if Brown were to get up and attempt to leave, but that her normal response would be to stop someone trying to leave the scene. Tr. 27. Utley testified that although she doesn't know how long she was there, the EMTs

arrived at 2:25 p.m. and Deputy Fohl arrived at 2:34 p.m. Tr. 31. The EMTs left the scene at 3:45 p.m. and Deputy Fohl left at 3:42. Tr. 32-33. The EMTs left before Utley and Wheeler . Tr. 33. Utley testified that when they entered the residence, they had to go up a set of stairs as it was a split level type of home. Tr. 34. Utley encountered Brown's mother, who owned the home, and she told them Brown was in the living room and pointed them towards it. Tr. 34-35, 39.

{¶7} Utley answered some questions from the court and indicated that at the time they were dispatched to the home, they had no idea whether this was drug related or not. Tr. 36. According to Utley, she and Wheeler had a 15 to 20 minute drive to get to the home. Tr. 37. The sole purpose for her and Wheeler to be at the home was to collect and preserve evidence as part of a criminal investigation. Tr. 37. The whole time that Utley was there, the only thing the EMTs did was stand around because they were done treating Brown. Tr. 38. Utley testified that she believed they could just enter the home because the EMTs were called to administer medical treatment and they already had an officer on the scene to whom they might offer assistance. Tr. 40. Utley admitted that she and Wheeler were not there to assist in the medical treatment. Tr. 41.

{¶8} On redirect examination, Utley testified that the conversation was "comfortable" and that she and Brown "were discussing things." Tr. 42. On re-cross examination, Utley testified that she escorted Brown outside when she

wanted to smoke a cigarette. Tr. 45. Whenever Brown left the couch, Utley went with her. Tr. 46.

{¶9} The second and final witness for the State was Wheeler. Wheeler testified that he was a detective with the Drug Task Force when the call was received to go to Brown's home. Tr. 50. Wheeler testified that they went to the scene in response to the new office policy to respond to all possible overdoses to collect evidence. Tr. 51-52. Wheeler indicated that upon the arrival at the house, the first contact with a person was with an EMT who informed them that Narcan was used. Tr. 53. At no time was Brown restrained, arrested, or told she was not free to leave. Tr. 53. When they first started speaking with her, Brown appeared to be a "little bit disoriented." Tr. 53. Wheeler testified that he only spoke with Brown for four to eight minutes before he left to speak to Brown's boyfriend outside. Tr. 54. When they arrived at the home, they saw the cruiser, but did not know where Deputy Fohl was, so they entered the home and encountered the EMTs. Tr. 55. According to Wheeler, he went and retrieved the backpack without any assistance from Brown. Tr. 57. After he had secured the backpack, Wheeler, Utley and Major Corwin spoke to Brown in the bathroom. Tr. 58. Wheeler then obtained a written statement from Brown. Tr. 59. Wheeler could not recall whether Brown ever asked if she was going to be arrested, but that he had no intention of doing so on that day. Tr. 59. Wheeler believed that Deputy Fohl was on the front porch talking to the family members. Tr. 60.

{¶10} On cross-examination Wheeler testified that when they arrived at the residence, they just walked into the home. Tr. 61. When they were first questioning Brown, both Wheeler and Utley were standing in front of her while she sat on the couch. Tr. 61. At any given time, there were two or three officers talking to Brown. Tr. 63. Wheeler testified that his permission to be in the home came from his supervisor as a result of the call. Tr. 63. Wheeler stated that he would have been surprised if Brown had wanted to leave because she was being cooperative. Tr. 68.

{¶11} At the end of the hearing, the trial court made the following statements.

> **The Court: There – there's two issues I'm struggling with. I'll give counsel to the end of the week to get me any additional legal authority on it.**
>
> **One issue I'm struggling with is the Officer's entry into the house. Now, at that issue, and let -- let me say this cause Mr. Spitzer's Motion is not – doesn't clearly raise that issue but then the questioning raised that issue.**
>
> **Mr. Spitzer: We were unaware prior to that.**
>
> **The Court: So, I mean, if -- if either side thought it was necessary to present additional evidence that would be relevant to that issue, I would – you could make that request before the end of the week. Well, I mean, if – if he – if he's in the house – if she's in – if the Officers are in the house illegally, why wouldn't the evidence that they encountered inside the house including the Defendant's statement be suppressed?**
>
> **Mr. Spitzer: Well before –**

**The Court: So, I mean, I guess the – the – so that one's a two part question is, you know, whether the Officer's [sic]– is there a constitutional violation by being in the house when they went in without permission? And if so, are the statements suppressed? You know, so I mean, I – I would allow either side to present some legal authority on that before the end of the week and if – if either side believes there's additional evidence that needs to be heard on that issue, I'd allow you to make that request before the end of the week.**

**The second issue then, goes to whether the Defendant is in custody status for purposes of requiring Miranda. I don't think there's any question there's an interrogation. You know, so the question is, is it a custodial interrogation? There's no dispute that Miranda wasn't provided. So there's a question of whether she was in custody. If anyone wants to provide any legal authority on that by the end of the week, I'll give you that opportunity then I'll make a Ruling, you know thereafter.**

Tr. 71-72.

{¶12} On January 16, 2015, the State filed a memorandum in response to the Court's suppression issues. Doc. 30. The memorandum did not request any further opportunity to present additional evidence to address the question raised by the trial court. *Id.* The trial court did not see the memorandum prior to issuing its ruling granting the motion to suppress on Tuesday, January 20, 2015.[2] Doc. 31. The next day, the State filed a motion for the trial court to reconsider its ruling so that its memorandum could be considered. Doc. 32. The trial court addressed it at a hearing on January 21, 2015, which had previously been scheduled to address a

---

[2] This court notes that the State's response was time-stamped at 3:20, Friday, January 16, 2015. The ruling was time-stamped as being filed at 2:50, Tuesday, January 20, 2015. Monday, January 19, 2015, was a holiday, so the courthouse would have been closed. During the second hearing, the court indicated it had not seen the State's memorandum prior to issuing its ruling. 2Tr. 2.

motion for intervention in lieu of conviction. 2Tr. 1-2. At that hearing the State indicated that it intended to 1) file a motion for reconsideration, which was done, and 2) file an appeal. 2Tr. 2. The trial court entered judgment on January 26, 2015, denying the motion for reconsideration. Doc. 33 at 3. Later that same day, the State filed its notice of appeal from the January 20, 2015 judgment entry. Doc. 34. On appeal, the State raises the following assignments of error.

**First Assignment of Error**

**The Court abused its discretion when it improperly suppressed evidence sua sponte at the conclusion of the suppression hearing without the issue being raised by a party in writing.**

**Second Assignment of Error**

**The Court erred when it suppressed the State's evidence based on the warrantless entry of [Utley] and [Wheeler] into the home.**

**Third Assignment of Error**

**The Court erred when it suppressed [Brown's] statements.**

{¶13} In the first assignment of error, the State alleges that the trial court erred by granting the motion to suppress on an issue that was sua sponte raised by the trial court at the hearing. The State argues that this denies them due process because they did not know of the issue prior to the hearing. The general rule in Ohio is that a motion to suppress must make clear the grounds upon which the motion is based so that the State may prepare its case and the trial court will know the grounds of the challenge to rule on the evidentiary issues at the hearing and

-10-

properly dispose of them. *Xenia v. Wallace*, 37 Ohio St.3d 216, 524 N.E.2d 889 (1988). "Failure on the part of the defendant to adequately raise the basis of his challenge constitutes a waiver of that issue on appeal." *Id.* at 218.A trial court errs by interjecting a new issue which is not supported by any evidence and basing its decision to suppress the evidence on the new issue without giving the State the opportunity to present evidence on the issue. *Dayton v. Dabney*, 99 Ohio App.3d 32, 649 N.E.2d 1271 (2d Dist. 1994). However, the trial court may expand the scope of a suppression hearing beyond the issues specified in the motion to suppress "so long as the matters within the expanded scope were material to the suppression sought, and so long as the State had a reasonable opportunity to prepare itself for the hearing." *State v. Blackburn*, 2d Dist. Clark No. 3084, 1994 WL 95224 (Mar. 23, 1994) at 4. *See also State v. Byrnes*, 2d Dist. Montgomery No. 25860, 2014-Ohio-1274 and *State v. Walton*, 5th Dist. Fairfield No. 97 CA 00063, 1998 WL 531865 (Mar. 26, 1998). When the trial court notes an issue not previously raised by the written motion during the hearing on the motion to suppress and that issue is material to the suppression sought, the trial court must give the State a reasonable opportunity to prepare itself for addressing the issue at the hearing before ruling on it. *Byrnes, supra* at ¶14. To fail to give the State that opportunity is unfairly prejudicial and the motion to suppress must be reopened to allow the State the opportunity to address the issue. *Id.* at ¶14-15.

{¶14} In this case, the issue raised by the motion to suppress had to do with Miranda warnings. During the course of the hearings, evidence was presented that the officers entered the home without a warrant for the sole purpose of conducting a criminal investigation. The trial court raised the issue sua sponte and informed the parties that they could address the issue later if they so wished. Prior to the State's memorandum being considered by the trial court and even though it was filed prior to the ruling, the trial court proceeded to grant the motion to suppress on the basis of the warrantless entry and on the custodial interrogation without providing Miranda warnings.[3] The failure of the trial court to actually give the State an opportunity to be heard on the issue of the warrantless search raised sua sponte at the suppression hearing denied the State due process. Therefore, the trial court erred and the first assignment of error is sustained.

{¶15} Since the first assignment of error indicated that the State was denied the opportunity to be heard on all of the issues, the judgment must be reversed and the State must be given the opportunity to be heard. The remaining assignments of error are thus rendered moot and this court need not address the second and third assignments of error at this time. App.R. 12(A)(1)(c).

---

[3] This court notes that there was a second judgment entry filed in response to the motion for reconsideration that did address the memorandum, but that judgment entry denied the motion for reconsideration and was not an appealable order. The State only certified the January 20, 2015 entry as the basis of the appeal, so that is the only entry we will address. Doc. 34. If the trial court had granted the motion for reconsideration, vacated the January 20, 2015 judgment, and reached the same conclusion after considering the State's argument, the January 26, 2015 judgment would be the one to be reviewed.

{¶16} Having found error prejudicial to the State, the judgment of the Court of Common Pleas of Marion County is reversed and the matter is remanded for further proceedings in accord with this opinion.

*Judgment Reversed*
*And Remanded*

**ROGERS, P.J. and PRESTON, J., concur.**

**/hlo**